IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 22, 2020 Session

## IN RE JACKSON D.

**Appeal from the Chancery Court for Bradley County**
**No. 2018-CV-224    Jerri S. Bryant, Chancellor**

_____

## No. E2019-02097-COA-R3-PT

_____

Ricky D. ("Father") appeals the termination of his parental rights to his minor child, Jackson D. ("the Child"). In July 2018, Heather M. ("Mother") and her husband, Jason M. ("Stepfather"), filed a petition to terminate Father's parental rights to the Child in the Bradley County Chancery Court ("Trial Court"). Following a trial, the Trial Court found that Mother and Stepfather had proven by clear and convincing evidence the ground of Father's ten-year sentence entered when the Child was younger than eight years old and that termination of Father's parental rights was in the best interest of the Child. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Eric S. Armstrong, Cleveland, Tennessee, for the appellant, Ricky D.

Randy Sellers, Cleveland, Tennessee, for the appellees, Jason M. and Heather M.

## OPINION

## Background

Mother and Father were married for approximately ten years. The Child was born in 2013 during the marriage. Mother and Father divorced in September 2016. The divorce decree stated that Mother and Father "shall have joint legal and [Mother] shall have primary physical custody of [the Child]." The parenting plan stated that Father was incarcerated in Georgia at that time "awaiting sentencing for charges relating to

inappropriate conduct with a minor teenager" and that Father would receive parenting time every other weekend after Father was released.

Prior to Father's criminal issues, he was a high school teacher. In December 2015 in North Carolina, Father pled guilty, pursuant to an *Alford* plea, to two counts of "sex offense [with a] student," which listed an offense date of May 2015. As a result of this plea, Father was sentenced to thirty-six months of supervised probation and was required to register as a sex offender for a period of thirty years.

Father was arrested again in March 2016 and was subsequently indicted in Georgia in June 2017 for criminal attempt to commit child molestation and computer pornography.[1] The indictment for computer pornography stated as follows in pertinent part:

> And the Grand Jurors, aforesaid, selected, chosen, and sworn for the County of Effingham, in the name and on behalf of the citizens of Georgia, do further charge and accuse [Father] with the offense of **Computer Pornography** in that the said accused, in said State and said County, on or about the 18th day of March, 2016, did intentionally utilize an online service to solicit a person believed by the accused to be a child under 16 years of age, to commit illegal acts as described in O.C.G.A. [Official Code of Georgia Annotated] 16-6-4(a) relating to the offense of Child Molestation, to wit: the accused arranged to meet with said child for the purpose of engaging sexual conduct with said child, contrary to the laws of said State, the good order, peace, and dignity thereof.[[2]]

---

[1] Georgia Code Annotated § 16-12-100.2(d)(1) defines computer pornography as follows:

> It shall be unlawful for any person intentionally or willfully to utilize a computer wireless service or Internet service, including, but not limited to, a local bulletin board service, Internet chat room, e-mail, instant messaging service, or other electronic device, to seduce, solicit, lure, or entice, or attempt to seduce, solicit, lure, or entice a child, another person believed by such person to be a child, any person having custody or control of a child, or another person believed by such person to have custody or control of a child to commit any illegal act by, with, or against a child as described in . . . Code Section 16-6-4, relating to the offense of child molestation or aggravated child molestation . . . .

[2] Georgia Code Annotated § 16-6-4(a) provides as follows in pertinent part:

> A person commits the offense of child molestation when such person:

> (1) Does any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person; or

In February 2018, Father pled guilty to computer pornography and received a sentence of twenty years, which included twelve years' incarceration. The remaining eight years could be served on probation so long as Father complied with the terms of his probation. The remaining charge was dismissed. Father had been incarcerated since March 2016 and was given credit for time served since then.

Mother married Stepfather in November 2017. The Child resided in the home with Mother and Stepfather. In July 2018, Stepfather and Mother (collectively, "Petitioners") filed a petition to terminate Father's parental rights to the Child, alleging grounds of Father's ten-year prison sentence, abandonment by failure to visit, abandonment by failure to financially support the Child, and abandonment by wanton disregard for the Child's welfare. The Trial Court conducted a trial in April 2019. At the beginning of trial, Petitioners announced that they did not intend to pursue the statutory abandonment grounds of failure to support and failure to visit. Although abandonment by wanton disregard was included as a ground in the petition, Petitioners' attorney informed the Trial Court that the only remaining ground at issue was the ground concerning Father's sentence of more than ten years with the Child being under the age of eight. Jackson was six at the time of trial. Petitioners included as exhibits copies of Father's criminal convictions and the Child's birth certificate. Mother, Stepfather, and Father testified during trial. Father appeared telephonically during trial.

Mother was the first witness during trial. According to Mother, Father and the Child played together often before Father was arrested. Mother testified that Father had been arrested and left the home in March 2016 and that Father had not seen the Child in person since that time. After Father was arrested, Mother allowed the Child to Skype with Father while Father remained incarcerated. Mother testified that she allowed that for approximately six months until it became apparent to her that the contact with Father was causing the Child anxiety. According to Mother, the Child began exhibiting separation anxiety after Father was arrested and had been concerned about when people would be returning. Mother further stated that the Child would wake up at night and come into her room to make sure she was still there. He also began exhibiting a fear of bugs. Mother testified that the Child also began defecating in his pants and the timing correlated to the Skype sessions with Father.

Mother stated that she discontinued the Skype visitation and that the Child had not seen or spoken to Father since that time. Mother testified that after the Skype sessions ended, those troubling behaviors of the Child "markedly got better the further away from [Father the Child] seemed to get." According to Mother, the Child had become very

---

(2) By means of an electronic device, transmits images of a person engaging in, inducing, or otherwise participating in any immoral or indecent act to a child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person.

outspoken, now liked to pick up bugs, did not wake up at night anymore, and no longer soiled his pants. Mother testified that Father had continued to write letters to the Child but that she had not read the letters to the Child. According to Mother, she had not destroyed the letters and had saved them for the future. Mother testified that the Child had at times spoken about Father and referred to him as "dada" but that the Child did not ask about him. Mother explained that she did not believe the Child had much memory of Father.

Mother testified that she had concerns regarding Father's decision-making process. According to Mother, Father's convictions "lead [her] to believe that he doesn't make good decisions, but also the nature of what kind of role model he'd be, what kind of things would he speak about in front of the child, what kind of things would he do with the child, what kind of places would he take the child, things of that nature." Mother stated that she had confronted Father with allegations that he had been with a seventeen-year-old girl in the family home while Mother and the Child were present in the home and that Father had not denied the allegations. Mother testified that she scheduled a therapy appointment for Father after his arrest in North Carolina. The facility changed the appointment to a time when Father could not go, and he never rescheduled the appointment. Mother is not aware of any therapy Father had received.

Both Mother and Stepfather are employed as pharmacists in Tennessee. Mother testified that Stepfather and the Child have a "typical father/son relationship." According to Mother, she and Stepfather equally shared parenting responsibilities. Mother testified that Stepfather sometimes got the Child ready and took him to school and that Stepfather had been teaching the Child math, how to ride a bicycle, to work on vehicles, and important moral things. They go to church and on family vacations together. According to Mother, Stepfather provided financially for fifty percent of what was needed for the Child. Mother testified that she believed the Child saw Stepfather as "dad" and that they had a very strong bond. Mother testified that Stepfather never speaks badly of Father. Mother and Stepfather had a seven-month-old child together. According to Mother, Stepfather did not treat the Child any differently than his biological child.

Mother did not dispute that Father loved the Child or that the Child had exhibited love for Father when they were together before Father's imprisonment. The Child also had become close with Father's side of the family, including the paternal grandmother. Mother explained that she believed the Child's relationship with the paternal grandmother was positive for the Child. The paternal grandmother and grandfather had stayed in Mother's home for the Child's birthday.

Mother testified that Father sent a letter to Stepfather asking him to withdraw the petition to terminate Father's parental rights. Mother stated that she interpreted the letter to have two tones. The first was requesting Stepfather to withdraw the petition, but the second she interpreted to be intimidating and informing them that he knew where they were. Mother acknowledged that Father had also stated that he wished her and Stepfather

nothing but the best, that he wanted to be part of the Child's life, that he was prepared to do whatever necessary to be a positive and pivotal role in the Child's life, and that he believed the termination action to be an injustice to the Child.

Stepfather testified as the second witness during trial. According to Stepfather, he was a pharmacy manager. Stepfather testified that he had always tried to be there for the Child to the best of his ability and to treat the Child the way Stepfather would want to be treated in the situation and like his "own blood." Stepfather testified that the Child is part of their family and that he wanted the Child to be the best person he could be. Stepfather testified that there was no difference between the Child and their new baby as far as being his sons. Stepfather further testified that the Child refers to him as "Dad." According to Stepfather, he has a "very healthy father/son relationship" with the Child that was "no different than . . . any other kid has with their father that's raising them."

Stepfather testified that he had no ill will toward Father. Stepfather stated that he did not believe Father's letter to him was a direct threat but there seemed to be an intimidating factor to it. Stepfather testified that he was part of the Child's life at the time the Child was having Skype communications with his Father. Stepfather explained that the Child would soil or defecate in his pants sometimes during the call and sometimes shortly after the calls. According to Stepfather, the Child's behaviors improved after the Skype calls with Father were stopped, and the Child's shyness and accidents had "pretty much been eliminated." Stepfather testified that the Child's behaviors were not a result of the Child's age because it seemed to go well between the calls with Father, "and then whenever [they] had the actual Skype conversations that's whenever [the Child] started having his accidents." Stepfather explained that the accidents did not get better until after the Skype conversations with Father had stopped. Although Stepfather was concerned about the Child's shyness, he explained that the Child had become very social and outgoing.

Stepfather opined that the Child's paternal grandmother, paternal grandfather, and paternal aunt had good morals and were good role models for the Child. Stepfather testified that they had a positive influence on the Child and that he had no resentment or ill will toward the Child having a continuing relationship with them.

Father testified as the third, and final, witness during trial. When Father and Mother were together, Mother worked as a pharmacist and Father worked as a high school teacher. Father testified that he had been a teacher for four years. After the North Carolina criminal charges, he stopped teaching. According to Father, Mother and Father subsequently decided that it would be cheaper for Father to be the caregiver for the Child while Mother was working. Father testified that at the time, the Child was "the happiest kid in the world" and that he was always laughing and enjoyed being with Mother, Father, and other people. Father explained that the Child also had times that he was quiet and would play by himself. Father testified that he had a very strong relationship with the Child and that the Child

would look to him for "guidance, protection, [and] all kinds of love." According to Father, the Child would come to him, and he made sure the Child had whatever he needed. They spent most days either at the park or at home learning. According to Father, they used to work on the Child's numbers and colors. Father further testified that he would go running with the Child in a stroller.

Father testified that he was incarcerated for only six days for the North Carolina charges from the time he was arrested until he was released on bond. Father further testified that he was currently incarcerated and had been incarcerated since March 18, 2016, except for a 24-hour period, on the Georgia convictions. Father testified that after he was arrested on the Georgia charges, he had Skype visits with the Child each week. Father stated that he was writing letters to the Child regularly. He initially sent letters for the Child to Mother at the paternal grandmother's home where she and the Child were residing and, after they moved to Tennessee, to the post office address she had given him. According to Father, the Skype visits ended in May 2017. After the Skype communications stopped, he sent "countless e-mails" to Mother and called her via telephone on several occasions. When Mother stopped communicating with him, Father started sending the letters and cards for the Child to the paternal grandmother. He testified that the paternal grandmother had a good relationship with the Child.

According to Father, Mother informed him when she moved to Tennessee in November 2016. Father testified that he had no problem with Stepfather and that he had heard Stepfather was a great man. He testified that he wanted Stepfather to see that Father was a good man and that he could trust Father. Father testified that he had tried to convey that in the letter he wrote to Stepfather.

Father testified of his progress while in prison. While in prison, Father had taken a "motivation to change class," where they discussed their behaviors and tendencies to make poor decisions, as well as how they should try to make the best decision for a more successful future. Father also took a reentry class focused on "having an idea of what you're going to do when you get out, [and] how to go about achieving those goals." Father also took a computer class focusing on Microsoft programs. He had been working in a GED program within the prison and teaching other inmates about social studies and language arts. Father testified that he had been reading his bible and praying every day and had recommitted his life to Christ. According to Father, he wanted to "keep a good moral compass" and make sure he was a better person. Father testified that while he was in another prison, he had gone to therapy "a few times." Although there is mental health therapy at his current prison, Father testified that he had not attended "because [he was] not classified to have mental health." He explained that there was a class he needed and planned to take for sexual offenders but that it had not been available to him. He planned to take that class before leaving prison if it was available.

- 6 -

Father testified that he had been given a date that he would be eligible for early release but that he did not have an early release date established. He testified that the classes he had taken in prison went toward his eligibility for early release, provided the parole board a reason to give him an early release, and showed "an initiative to be a better citizen." According to Father, part of the reason for taking some of the classes was to improve his chances of an early release. Father testified that, hypothetically, if he were released in 2020 on early release, he would reside with the paternal grandmother for six months, get a job, save money, and move to Chattanooga to be closer to the Child. Father testified that he expected this would take less than a year. As far as employment, Father intended to look into jobs in education, mechanical, construction, food service, warehousing, or anything available. Father acknowledged that if he was released from prison on probation, he would not be allowed around any other children, that he would not be allowed to go to the park with the Child if other children were present, and that there would be limitations on him attending any event where other children were present.

Father testified that his two North Carolina convictions of "sexual offense with a student" were with a seventeen-year-old female. According to Father, he was around thirty-one years old at the time. He testified that both convictions involved the same female. Father testified that he was required to register as a sex offender as a result of both the North Carolina convictions and the Georgia conviction.

Father testified that he did not believe he had a problem related to his previous convictions but that he believed that he "was acting out in depression." Father explained that he was very depressed and unhappy in his marriage and that he "acted the worst way possible." Father acknowledged that he had not received mental health treatment for depression. He stated that he knew he did not have a problem because he did not have the same desire to continue that behavior. Father testified that he had no excuse and knew his behavior was wrong. Father denied that he ever met with an individual he believed to be fifteen years old in Georgia who he later discovered was an undercover police officer. Father, however, acknowledged pleading guilty to computer pornography.

At the conclusion of trial, the Trial Court granted Petitioners' petition to terminate Father's parental rights. The Trial Court subsequently entered a judgment, finding as follows concerning the termination of Father's parental rights:

> [T]he Court rendered a Bench Opinion finding by clear and convincing evidence that Petitioners had proven grounds for termination of [Father's] parental rights pursuant to T.C.A. 36-1-113(g)[(6)] providing that if a person is convicted of a crime and sentenced to a period of ten (10) years or more and the minor child, which is the subject of this matter, is under eight (8) years of age. In addition, the Court rendered its opinion that it is in the best interests of the minor child for the parental rights of [Father] to be terminated, which specific findings are as follows:

a. The Court finds by clear and convincing evidence that Petitioners have proven the grounds at T.C.A. 36-1-113(g)(6) in that [Father] has been sentenced to a prison term of more than 10 years and [the Child] is under 8 years of age;

b. The Court then made findings as to best interest factors to terminate the parental rights of [Father] as noted in T.C.A. 36-1-113(i) as well as case law because the best interest list of factors is not to be exhaust[ive];

c. As to the parents' adjustment to make custody safe, [Mother] has remarried and it is her husband that is asking to adopt [the Child]. [Mother] and her new husband, Petitioners herein, have moved away from the town of where the events happened regarding Respondent/Father's criminal conviction so [Mother] has certainly made an adjustment to make custody safe with the step-father;

d. [Father] has not made any adjustments to make custody safe today and still resides in prison;

e. Pursuant to the statute and case law, the best interest's factors are to be looked at according to the child's perspective or concerning the child. Regarding such, the Court finds that the child is doing better now that the child is getting farther and farther away from the time when [Father] was around the child. The Court further finds that, according to [Mother], the child is no longer defecating inappropriately, that his health is better, that he is not as scared as he used to be, he has made an adjustment and is doing well as child;

f. [Mother] and [Stepfather] are both financially able to care for the child and that they have adequate housing for the child;

g. The second part of the statute as to best interests is regarding failure to make adjustments after reasonable efforts from social services. The Court finds that this does not apply in this situation;

h. [Father] has not had regular visits with the child nor has [Father] paid Guideline support;

i. As to the parents' mental status, there has been no showing that there is anything wrong with [Mother's] or [Stepfather's] mental status. Both Petitioners presented well in Court and the Court finds that they are very credible;

j. The Court queries as to whether there is a problem with [Father's] mental status and the Court finds that hasn't been shown, other than an allegation that the letters that [Father] wrote to the child may be inappropriate; however, the Court finds that it does not consider those letters as they are not in evidence but they are for identification only;

k. As to the safety and health of the parent's home, [Mother] has shown pictures of her home and the Court finds that it is a safe and healthy home. It appears to be nice and clean, and well organized, at least from the pictures and so that preponderates in the favor of the child having a safe home;

1. The Court finds that there is no proof of either parent being a child abuser;

m. The Court finds that [Father] was certainly exhibiting neglectful or poor judgment after being arrested in North Carolina and having a conviction there and again being involved in a sex related crime in Georgia. The Court finds that he was at least using poor judgment at that time;

n. As to the effect a change of the caretaker of the child may have on this child if he gets back into [Father's] custody, there is really no real proof of that. In fact, the proof is just the opposite in that the child does not even know the father, and that the child has known [Stepfather] for longer than the child has known [Father]. [Father] was first arrested when the child was approximately 2 to 2 1/2 years old and the child is now 6;

o. The child becomes questioning when [Stepfather] leaves so that is some indication to the Court that a change of the caretaker from the [Stepfather] would not be in the child's best interests. The Court finds that the only proof is that the [Stepfather] has a meaningful relationship with the child and that there is no proof of a relationship of [Father], at this point;

p. Regarding the above-findings, the Court is to look at all these factors with the child at the center of them and the Court is to consider where the continuation of [Father's] relationship would serve the child. Further the Court finds that this is not whether [Father] would miss the child, as it is not about [Father's] efforts by sending letters to the child, but this is about the child's relationship with the father and the Court finds that there is no relationship to continue between father and child;

q. It is in the best interests of the child in these cases where the Court considers the bond with the parent and the child and not the parent with the child. The Court notes In re: LSS, 2007 Tenn. App. LEXIS 597 in looking

- 9 -

at those factors there is no evidence here that the child knows [Father], that the child would miss [Father], that the child has a relationship with [Father] and that even after release at whatever time, the father cannot be around children. Further, it would still be several months or longer even on father's estimate of up to a year before he could assume responsibility for his child;

r. The father planned to live with his parents after release, whenever that is, but the Court further finds that is speculative at this point. Further, the Court finds that the father testified that he wanted to save money and then move to Chattanooga but he has no job and no place to live;

s. The child has known time without [Father] more than he knew time with [Father] before the conviction. The Court further finds that [Father] cannot provide the child a home or support within a reasonable amount of time and further the Court finds, pursuant to In re: M.E.W., 2004 Tenn. App. LEXIS 250 that the child has an interest in finality and a stable home;

t. Even though [Father] argues that if he keeps on a good path and continues to ready himself, he will be available for early release. The Court finds that such is speculation at this point and the Court further finds that weighing that with the factor of the child deserving of permanency, the Court finds clear and convincing evidence that it is in the child's best interest for [Father's] parental rights to be terminated.

Father timely appealed.

## Discussion

Although not stated exactly as such, Father raises the following issue for our review on appeal: whether the Trial Court erred in finding by clear and convincing evidence that the termination of Father's parental rights was in the Child's best interest.

With regard to the termination of parental rights, our Supreme Court has instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley*

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

*v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1[-]113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Additionally, the Trial Court is the arbiter of witness credibility of those who testify live before it. As our Supreme Court has instructed:

- 13 -

When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

Although Father has not raised grounds as an issue on appeal, our Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (footnote omitted). Therefore, we will address the ground utilized for the termination of Father's parental rights.

The Trial Court found only one ground regarding the termination of Father's parental rights. Tennessee Code Annotated § 36-1-113(g)(6) provides the following as a ground for the termination of parental rights:

The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court[.]

Petitioners entered as an exhibit at trial a copy of Father's criminal conviction in Georgia, as well as a copy of the Child's birth certification. Father acknowledged that he was currently incarcerated at the time of trial. The record establishes that Father had been sentenced by the Georgia court to incarceration of more than ten years and that the Child was less than eight years old when the sentence was entered. As such, we find and hold, as did the Trial Court, that Petitioners proved this ground by clear and convincing evidence.

Next, we will address Father's argument concerning whether the Trial Court erred by determining that termination of Father's parental rights was in the Child's best interest. Tennessee Code Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

(i)     In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2019).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome

determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

On appeal, Father contends there was insufficient evidence presented at trial to prove by clear and convincing evidence that termination of his parental rights was in the Child's best interest. According to Father, there were "numerous facts proven at trial that were relevant to this enquiry that the trial court did not properly consider in its ruling." Father then proceeds to identify his concerns with the Trial Court's analysis of the best interest factors.

Father specifically argues that the Trial Court failed to consider the "very strong relationship" between Father and the Child prior to Father's incarceration. The evidence before the Trial Court supports Father's assertion that he had a strong relationship with the Child before he became incarcerated. As the Trial Court noted, the Child was two or two-and-a-half years old when Father was first arrested in North Carolina. After Father lost his teaching job, he became the caregiver for the Child while Mother worked. However, Father had been incarcerated since March 2016, when the Child was around three years old. By the time of trial, the strong relationship that had existed between Father and the Child had diminished such that the Child had very little memory of Father. Both Mother and Stepfather testified that Stepfather had developed a father-son relationship with the Child while Father had been incarcerated.

According to Father, he "made every effort" to maintain a relationship with the Child after he became incarcerated. The proof supported that Father had Skype visits with the Child once a week after he became incarcerated for a period of time. Father states on appeal that his relationship with the Child was "ended by the actions of [Mother] when she stopped the relationship." It was, however, Father's actions that had resulted in his incarceration. While on probation in North Carolina for two convictions of sexual contact with a student, Father was indicted in Georgia for, and later pled guilty to, a charge of computer pornography after he utilized an online service to solicit an individual he believed to be under sixteen years of age to commit illegal acts related to the offense of child molestation. Even after his incarceration, Mother allowed Skype visits between Father and the Child until the Child began exhibiting anxiety behaviors after his Skype visits with Father. Both Mother and Stepfather testified about the Child's behaviors during that time, and the Trial Court found both Mother and Stepfather to be credible witnesses. The Trial Court considered the fact that Mother had stopped the Skype visits between the Child and Father and found that the Child's behaviors had improved "now that the child is getting farther and farther away from the time when [Father] was around the child."

At the time of trial, the Trial Court found that there was no evidence that the Child knew Father or would miss him. As the Trial Court found, the best interest factors do not concern whether Father would miss the Child or Father's effort of sending letters to the Child, but instead involve the Child's relationship with Father, which the Trial Court found to be nonexistent by the time of trial. The evidence presented does not preponderate against the Trial Court's findings concerning the relationship between Father and the Child.

Father also argues that the Trial Court did not take into account Father's chances for early release from prison, his plan upon release, or the steps Father took while incarcerated "to fortify himself against recidivism after he gets out," which included attending "re-entry to society classes, good decisions class, [and] computer classes," working at the prison as a GED instructor, and his religious practices and beliefs since entering prison. The Trial Court acknowledged Father's argument during trial that if Father kept "on a good path and continue[d] to ready himself" that he could be available for early release. However, the Trial Court found that Father's testimony concerning early release was speculative and that even if he was released early, Father's plan to relocate to Chattanooga to be close to the Child would take at least several months or longer by Father's estimate before he could assume responsibility for the Child. The Trial Court noted that Father did not have a job or a place to live in Chattanooga. The Trial Court further noted that even after Father's release, Father would not be allowed around other children. Father acknowledged during his testimony that there would be restrictions on him being around other children due to his sex offender status. The record reflects that the Trial Court did consider Father's testimony concerning early release, his plan after release, and the progress he had made while in prison when making its determination regarding best interest.

Father further argues on appeal that the Trial Court "did not properly consider the uncontradicted testimony offered by [Father] that he did not believe he has lingering problems." Father testified that he had been "acting out in depression," was very unhappy in his marriage with Mother, and "acted the worst way possible." Father further testified that he knew he did not "have a problem" because he no longer had "the same desire to do anything like that." The Trial Court considered Father's criminal behavior in both North Carolina and Georgia, but its judgment does not discuss whether Father continued to have "lingering problems" at the time of trial. The Trial Court found that no problem with Father's mental health had been shown but recognized that Father "was certainly exhibiting neglectful or poor judgment after being arrested in North Carolina and having a conviction there and again being involved in a sex related crime in Georgia." Even taking Father's testimony that he has no "lingering problems" with regard to his convictions, this testimony would not weigh against the other factors considered by the Trial Court that weigh in favor of the termination of Father's parental rights.

The Trial Court properly considered the best interest factors, codified at Tennessee Code Annotated § 36-1-113(i), and made detailed findings of fact concerning those factors. Upon review of the Trial Court's findings of fact concerning the best interest analysis, the

evidence presented at trial does not preponderate against any of them.  We find and hold, as did the Trial Court, that Petitioners proved by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.  We, therefore, affirm the judgment of the Trial Court.

### Conclusion

The judgment of the Trial Court terminating Father's parental rights to the Child is affirmed.  This cause is remanded to the Trial Court for collection of the costs assessed below.  The costs on appeal are assessed against the appellant, Ricky D., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE